HARRINGTON, RESPONDENT, *v.* BUTTE & BOSTON MINING COMPANY ET AL., APPELLANTS.

[Submitted April 1, 1897. Decided April 26, 1897.]

*New Trial—Conflict in Evidence—Burden of Proof—Pleading—Evidence—Cross-Examination—Res Gestae.*

NEW TRIAL—*Conflict.*—Where the evidence is conflicting, an order denying a new trial will not be reversed on the ground that the evidence does not justify the verdict.

ENDORSEE OF CHECK—*Good Faith—Burden of Proof.*—In action against the maker of a check brought by endorsee, the burden is upon the plaintiff to prove good faith, according to the rule laid down in *Rossiter* v. *Loeber*, 18 Mont. 372.

SAME—*Pleading.*—It is not necessary to allege in the complaint that the check was bought in good faith by the endorsee.

SAME.—Where the answer alleges that the check was fraudulently procured by the endorsee, the issue is formed by sufficient denials in the replication.

SAME—*Evidence—Cross-Examination.*—In an action by the endorsee of a check against the maker and the payee, the answer alleged that the check was obtained without consideration and by false and fraudulent practices, and transferred to plaintiff without consideration and for the purpose of defeating the defendant's defense; on direct examination plaintiff testified that he had had some business transaction with "L," the payee of the note; on cross-examination the witness was asked if he had not gambled in his own saloon and won several hundred dollars from the payee. *Held*, error to sustain an objection to the question on the ground that it was immaterial.

SAME—*Res Gestae—Conspiracy.*—In such an action, the declaration of the payee of the note, made a few hours after his transfer of the same, and stating that he had obtained it by gambling, and that he endorsed it so that the money could be obtained on it for him, is admissible in evidence, although not made in the presence of his endorsee, as it is part of the *res gestae* and tends to show a conspiracy.

SAME—*Instructions.*—In such an action, an instruction to the effect that it is admitted that the check was "duly endorsed" by the payee, is misleading, as the jury might infer that the check was endorsed in a lawful manner.

SAME.—In such an action, where there is evidence tending to show that plaintiff had reason to suspect that the check was improperly obtained, an instruction which confines the jury to the question of plaintiff's actual knowledge of fraud, is improper.

*Appeal from District Court, Silver Bow County. J. J. McHatton, Judge.*

ACTION by Phil J. Harrington against the Butte & Boston Mining Company, John A. Leggat, and others. There was judgment on a verdict for plaintiff. A motion for a new trial was denied, and defendants appeal. Reversed.

Statement of the case by the justice delivering the opinion.

The general nature of this controversy is stated in the first instruction of the trial court, which reads as follows: "The plaintiff in this cause sues the defendants upon a check given by the defendant Butte & Boston Mining Company, payable to John A. Leggat, and by said Leggat endorsed to the defendant Wearth, and by said Wearth endorsed to the plaintiff, Harrington. It is alleged by the plaintiff that he purchased the said check from the defendant Wearth, paying the face value thereof, and that upon presentation to the First National Bank of Butte, upon which the check was drawn, the payment thereof was refused.

"The defendants Butte & Boston Mining Company and John A. Leggat answer that the said Wearth obtained the same without consideration, and by false and fraudulent and deceitful practices, and that the same was transferred to the plaintiff, Harrington, without consideration, and for the purpose of defeating said defendants Butte & Boston Mining Company and Leggat in any defense that they might set up against the enforcement of the check."

The facts, from respondent's standpoint, were substantially as follows: On the night of the 15th and 16th of February, 1895, in the Lynch saloon, in Butte, Leggat, while under the influence of liquor,—to what extent, the evidence is conflicting,—engaged in a game of cards with Wearth, a comparative stranger, whom he encountered there. The game was played in the presence of a constant companion of Wearth,—one Donavan. The result of it was that Leggat lost about all the cash he had with him, and in addition thereto a check for

$2,500. At about 9 o'clock in the morning of the 16th of February, Wearth took this check to another drinking saloon near by, and caused its proprietor, Harrington, to be aroused from bed for the purpose of getting it cashed. Wearth was a fireman or boiler engineer, accustomed to earn, when he worked, about $4 a day, but for several months had been out of work. These facts were known to Harrington. Wearth had been a frequenter of the latter's saloon, and had run up a bill there (extending over a period of several months) of $80 for "whisky, cigars, playing cards, and having drinks, and one thing and another." Harrington knew Leggat, was familiar with his signature, and admits that, as written on the check, it was different from his usual signature. Harrington says that when Wearth presented the check to him, and requested him to deduct the amount he owed and give him the remainder in cash, he cashed the check, without any question as to how it came into Wearth's possession. He only asked, "Did you see Mr. Leggat sign this?" to which the reply was, "Yes." Wearth, according to Harrington, was paid $1,750 before the banks of the city opened, as was their custom, at 10 o'clock a. m., and the remainder, less the bill of $80, just after the banks opened, from money obtained from a bank by Harrington's barkeeper, who had been sent to cash other checks in Harrington's possession, but not the one in controversy. Harrington states that, shortly after paying Wearth in full, he learned from Donavan that payment of the check had been stopped at the banks of the city. He says that he thereupon went to a bank to obtain payment of this check in controversy, which was refused, or (he does not remember exactly the order of events) he proceeded to the Lynch saloon, where he found Leggat and Wearth. He testifies: "I went after Lynch (the proprietor, who was present also), and asked him if he could get them together. I said, 'You might get this thing settled for a few hundred dollars, and I can't afford to be out of the money.'"

The testimony was conflicting in a great many particulars. Lynch testified in behalf of defendants that Harrington came

into his saloon with Wearth before 10 o'clock, and only claimed to him then that he had paid $1,750 on the check.

Instruction No. 9 given by the court is as follows:

"You are further instructed that it is admitted by the pleadings in this action that the defendant Leggat duly endorsed the said check in blank to the defendant John A. Wearth on or about the 16th day of February, 1895."

Instruction No. 11 given by the court reads as follows:

"You are further instructed that if you find from the evidence in this case that on or about the 16th day of February, 1895, the defendant John A. Leggat endorsed the check sued upon in this action in blank to the defendant John Wearth, and that thereafter the said John Wearth endorsed and transferred the said check to the plaintiff in this action for value, and that, at the time that plaintiff procured the endorsement of the same for value by the said Wearth, he had no notice of the manner in which the said Wearth procured the said check, or any notice of any defense thereto on the part of the defendant Leggat, or of any other defendant in this action; and if you further find from the evidence that the plaintiff is the owner and holder of the said check, for value, without notice of the said defenses, or any of them, and that the same has not been paid; and if you further find from the evidence that the plaintiff presented the said check for payment, and that payment of the same was refused,—you should find a verdict in plaintiff's favor, and against all the defendants herein, for the sum which he paid therefor or thereon, with interest thereon at the rate of ten per cent. per annum from the 16th day of February, 1895."

Instruction No. 12 given by the court is as follows:

"You are instructed that if you find from the evidence in this case that the defendant Wearth procured the check sued upon from the defendant Leggat as a wager or bet upon a game, or any gambling proposition, and that thereafter the said defendant Wearth sold and transferred the said check to this plaintiff for value; and if you further find from the evidence that, at the time plaintiff purchased the said check

from the defendant Wearth, it was endorsed by the defendant Leggat and also by the defendant Wearth, and that plaintiff, having no knowledge of the manner in which the said Wearth procured the same from the said Leggat, purchased the same from the said Wearth in the ordinary course of business, and in good faith, and for a valuable consideration,—you should find a verdict in plaintiff's favor, and against all the defendants herein, for the amount of the face value of the said check, with interest thereon from February 16, 1895, if you find that he paid face value therefor, and, if not, then for such amount as you may find he paid for it, if you find he paid value therefor.''

The trial resulted in a verdict for the plaintiff, and this appeal is from an order denying a motion for a new trial, and from the judgment.

*Forbis & Forbis*, for Appellants.

*John W. Cotter*, for Respondent.

BUCK, J.—It appears from the record that there were many suspicious contradictions and evasions in the evidence given by Harrington, the plaintiff, and Wearth and Donavan, who were his main witnesses.   These it is needless to enumerate.   But, regarding Harrington's explanation of his participation in this transaction in the most favorable light to himself, we should not hesitate to set aside the verdict on the evidence, were it not for the rule that, where there is a conflict in the evidence on the trial, an appellate court should not trench upon the province of the lower court and its jury.

By a mere question, no doubt, Harrington could have ascertained how Wearth obtained possession of the check, and the total lack of consideration therefor, as between himself and Leggat.   As a man of ordinary business prudence, should he not have endeavored to obtain this knowledge before paying out such a large amount of money to a man whose financial standing was of so dubious a character as Wearth's?   Could he not have waited until the banks opened before paying Wearth the $1,750 he claims to have paid before 10 o'clock

that morning ?   His failure to ask any questions, the unusual signature of Leggat, Wearth's financial condition, Wearth's haste to have the check cashed, and the fact that, in order to save a bill of $80, he was willing to risk the loss of $2,420, all indicate a most unusual line of conduct, so far as he is concerned, and are hardly compatible either with ordinary business prudence or even common honesty.   But our decision must depend on other considerations than the sufficiency of the evidence to justify the verdict.

It is assigned as error that the pleadings do not support the judgment.   Appellants' counsel urge that upon the authority of *Thamling* v. *Duffey*, 14 Mont. 567, 37 Pac. 363, the burden of proof was upon plaintiff, under the existing conditions of the case, to establish his good faith in the purchase of the check, and that he should have pleaded his good faith in the complaint or replication.

The lower court properly instructed the jury as to the burden of proof, in accordance with the rule laid down in *Thamling* v. *Duffey*, *supra*.   Modified in *Rossiter* v. *Loeber*, 18 Mont., 372.

It is true that the complaint does not aver good faith on the part of the plaintiff, but until the plea of fraud was filed, such an allegation in the complaint would have been unnecessary.

Even, however, if it was necessary for the plaintiff to plead good faith, the averments of the replication sufficiently meet any such requirement.   It denies any fraud or collusion, and alleges that the plaintiff purchased the check for its face value in the due course of business, and without any knowledge or information at the time of any defense to it.

During the cross-examination of Harrington he testified : "I had had transactions with Mr. Leggat before.   I had cashed his checks frequently, and I believe he paid me a bill of $6 at one time.  I have not had any other transactions with him, that I remember, though there might have been others." This question was then asked him :  "Had you not in your own saloon gambled with Leggat, and won several hundred dollars from him ?"

The question was objected to as not cross-examination, and immaterial. The objection was sustained, and an exception noted.

It is true, as a general rule, that a defendant should not be permitted to make out his case on cross-examination, and that he should be confined therein to matters brought out on the direct examination. If a defendant could make out his case on cross-examination, he might employ leading questions for the purpose. It often happens, however, that no boundary line can readily be drawn between a question put directly on the theory of making out a positive defense, regardless of what has been testified to on the direct examination, and a question asked with a view only to have explained, negatived or modified what has been stated by a witness on his direct examination. Hence no little discretionary power is vested in the trial court in its control of the scope of cross-examination. The orderly conduct of the trial demands this. (See *Neil* v. *Thorn*, 88 N. Y. 270, and *Thornton* v. *Hook*, 36 Cal. 223.)

The general rule should not be rigidly adhered to, unless the distinction as to what is pertinent cross-examination, and what is an attempt to make out a defense independently of the direct examination, is clear. The purpose of this rule is for the marshaling of the evidence only, and it can never be properly invoked for the exclusion of any evidence that is material or competent. If the distinction is not clear, the counsel cross-examining a witness may, with the court's permission, make the witness his own, or else may wait until the proper time arrives for making out his defense, and then put the questions the propriety of which was doubtful on the cross-examination.

We think the question to which the objection was sustained should have been allowed, in so far as the materiality of the answer to it was concerned. The answer might have been material as tending to shed light on whether Harrington had reason to doubt the *bona fides* of Leggat's indorsement, and the consideration for the same, when Wearth presented the check to him. If Harrington knew that Leggat gambled in

saloons, that knowledge was a circumstance for the jury to consider in determining his good faith.

The question was objected to both as being immaterial and not cross-examination. If the court had excluded it solely on the ground that it was not proper cross-examination, we would uphold its ruling, because of its discretionary power in respect to controlling cross-examination. But we cannot tell whether it did or not, under the double objection made. Even on cross-examination, however, it would have been proper to have allowed it, and immediately thereafter Harrington was properly enough allowed to be cross examined as to Leggat's getting drunk at times. The question was pertinent as to the extent of the acquaintance Harrington had with Leggat.

Lynch testified in behalf of the appellants that he had gone to the different banks in the city before they opened, and stopped payment of the check in controversy, and that, upon his return before the time of the opening of the banks, Harrington and Wearth had together entered his saloon. He said: "Just after I got back to my place, Harrington and Wearth came in there. I told Wearth that I wanted to see him, and I took him into the back room, and asked him about Leggat's check; and he said he won it from him, playing cards."

Objection was made to the conversation because it was had without the hearing of Harrington, and the objection was sustained.

Again, the following question was put to Lynch as to what occurred at the same time : "What did Harrington say about it?" and he answered : "I called Wearth back into the room, and told him he had better give me back the check, or give it back to Leggat, and he said : 'I have not got the check, Ed. I gave it to Mr. Harrington, and he is going to have it cashed for me.'"

This latter testimony was stricken out, on the objection that it was not responsive to the question and was incompetent.

We think that both these rulings were erroneous. On the theory that Lynch was telling the truth when he stated that Harrington, accompanied by Wearth, came into his saloon be-

fore the banks opened, and only claimed to have paid $1,750 on the check (which contradicts Harrington's testimony as to the payment of any money to Wearth after the opening of the banks at 10 o'clock), this testimony was admissible as tending to establish collusion and a conspiracy between Wearth and Harrington. Between the time of the payment of the $1,750 to Wearth (which, according to Harrington, was some time after 9 o'clock) and the coming of himself and Wearth into Lynch's saloon (before 10 o'clock, according to Lynch's testimony), the interval would necessarily have been very brief; and if Harrington before 10 o'clock only claimed to Lynch to have paid $1,750 on the check, the conspiracy, if there was one, was still in progress. In this view, both as a part of the *res gestae*, and as a declaration of one of the conspirators against another, the evidence was competent.

But respondent's counsel urges, even if this evidence were competent, the last answer was properly stricken out, because it was not responsive to the question which brought it forth.

We cannot agree with this last contention. Under the circumstances, competent evidence should not have been stricken out, even though it was there improperly from a merely formal point of view.

We think that the giving of instruction No. 9 was prejudicial error. It might readily have conveyed to the jury the idea that Leggat duly (that is, in a lawful manner) indorsed the check to Wearth. The answer denied that Leggat had "duly indorsed" the check to Wearth. True, the denial that the check was duly indorsed, considered by itself, would be a denial of a legal conclusion only. But the gist of the issue in the case was the legality, under the facts, of the indorsement.

Respondent's counsel says in his brief: "We may admit that the instruction was drawn and given by an oversight, and admit that the answer attempted to deny the indorsement of the check by the defendant Leggat to Wearth. However, * * * upon the witness stand the defendant Leggat admits that it is his indorsement, and the mere 'fact of a mistake in the instruction that it was admitted by the pleadings in the

action, instead of stating that it was admitted by the defendant in his testimony, we submit, is not sufficient to justify a reversal of the case, as it is not prejudicial error."

We cannot agree with this. It is true, Leggat admitted in his testimony that the signature was his, but he stated that he was too drunk to know what he was doing when he signed his name.

Objection is also made to instructions Nos. 11 and 12. We think the first is objectionable in two respects : It might readily have conveyed to the jury the impression that, if Harrington had no actual notice of the manner in which the check had been obtained by Wearth, then he was acting in good faith. It also overlooked the fact that, if Harrington had paid only $1,750 on the check before he learned that it was obtained in gambling, he was nevertheless, under its terms, even if he paid the remainder after such knowledge, entitled to recover whatever he paid on the check.

Instruction No. 12 is also objectionable in the last aforesaid point of view. We do not think the other instructions given properly cured the defects in these instructions 11 and 12. The judgment is reversed, and the cause is remanded, with directions to the lower court to grant a new trial.

*Reversed and Remanded.*

PEMBERTON, C. J., and HUNT, J., concur.